UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

HANNIBAL DEVELOPMENT, LLC
d/b/a HANNIBAL DEVELOPMENT
PARTNERS, LLC,

        **Plaintiff,**                         **Case No. 2:18-CV-1265**
                                         **JUDGE EDMUND A. SARGUS, JR.**
        **v.**                         **Chief Magistrate Judge Elizabeth P. Deavers**

LACKAWANNA TRANSPORT COMPANY
d/b/a WETZEL COUNTY LANDFILL,

        **Defendant.**

## OPINION AND ORDER

The instant matter is before the Court for consideration of a Motion for Partial Summary Judgment filed by Plaintiff Hannibal Development, LLC d/b/a/ Hannibal Development Partners, LLC ("Plaintiff"). (ECF No. 26 & 27). Defendant Lackwanna Transport Company d/ba/ Wetzel County Landfill ("Defendant") has responded (ECF No. 28), and Plaintiff replied. (ECF No. 29). The instant matter is ripe for review. For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment is **DENIED in part** and **GRANTED in part**. (ECF No. 26 & 27).

**I.**

### A. Background

The instant matter arises from an ongoing transactional dispute between Plaintiff and Defendant. The parties are at odds over who will bear the disposal cost for alumina that Plaintiff transported to Defendant's landfill. The undisputed facts of this case are as follows:

### a.  History of Plaintiff's Business

Around 2014, Plaintiff purchased certain assets from Ormet Aluminum Mill Products Corporation. (ECF No. 27-1 at ¶ 3, Spirtas Aff.).  As part of that purchase, Plaintiff acquired a 1700-acre industrial site that was previously used for smelting aluminum (the "Hannibal Property"). (*Id.* at ¶ 4). Plaintiff sold the Hannibal Property in June of 2017, but continued to undertake contracts for various demolition, remediation and environmental projects related to it. (*Id.* at ¶ 5).

Eric Spirtas is Plaintiff's President and Steve Garner previously worked as Plaintiff's Operations Manager. (*Id.* at ¶ 2 & 6). As Operations Manager, Garner oversaw various contractual projects concerning the Hannibal Property. (*Id.* at ¶ 6). Spirtas frequently traveled to the Hannibal Property as well, and he communicated with Garner almost daily from June 19, 2017 until Garner's termination in December of 2018. (*Id.* at ¶ 7).

In the spring of 2018, Spirtas contacted David Pritt to ask whether the Wetzel County Landfill (the "Landfill") would take Plaintiff's alumina free of charge in exchange for its use as a solidification agent for the Landfill. (*Id.* at ¶ 8).

### b.  Solid Waste Services of West Virginia, J.P. Mascaro & Sons and the Landfill

Pritt served as General Manager for Solid Waste Services of West Virginia ("SWSWV") from May of 2015 until his termination in July of 2018. (ECF No. 28-1 at 7-8, Pritt Dep.). SWSWV is a company that primarily provides waste transportation services. (*Id.*). By his own admission, Pritt ran virtually evert aspect of SWSWV's operation. (*Id.*). His duties included: "[b]asically everything [one] can imagine running a trucking business. I started out with the schedule for the day. I did sales, new business, keep up old business. I took on new customers. I took on old customers that we had previously lost. I basically ran the day-to-day operation." (*Id.*)

2

The Landfill and SWSWV share some common ownership through J.P. Mascaro & Sons ("J.P. Mascaro"); but the two entities do not share a parent-subsidiary relationship and they are not subsidiaries of a common corporate parent. (ECF No. 28-2 at ¶ 2-4, Fox Aff.). Rather, Defendant, a private West Virginia corporation, is the Landfill's owner, operator and permittee. (*Id.* at ¶ 4).

According to Defendant's Director of Engineering, Ryan Inch, SWSWV used the Landfill to dispose of almost all of its customer's waste. (ECF No. 28-4 at ¶ 2 & 7, Inch. Aff.). Typically, when SWSWV transports waste to the Landfill, the waste is weighed on an electronic scale, and SWSWV pays the Landfill a West Virginia Public Service Commission approved per-ton rate for its disposal. (*Id.* at ¶ 9).

According to William Fox who is General Counsel for J.P. Mascaro, SWSWV, and Defendant, Pritt was not authorized to make decisions concerning disposal or solidification at the Landfill. (ECF No. 28-1 at 23, 29 & 30, Pritt Dep.; ECF No. 28-2 at ¶ 7, Fox Aff.). In that same vein, Fox states that Defendant never employed Pritt, and it never authorized Pritt to speak or act on its behalf. (ECF No. 28-2 at ¶ 7, Fox Aff.).

### c.  Early 2018 Non-Alumina Waste Transportation

According to Fox and Pritt, Plaintiff used SWSWV's services in 2017 and 2018, and Garner served as Plaintiff's sole point of contact during that time. (ECF No. 28-2, Fox Aff. at ¶ 8; ECF No. 28-1, Pritt Dep. at 10-11). Pritt and Garner first established contact in early 2017 to arrange a supply of small commercial containers for basic cleanup at the Hannibal Property. (ECF No. 28-1, Pritt Dep. at 12). From that point on, Pritt and Garner made arrangements to transport several materials from the Hannibal Property to the Landfill. (*Id.*).

The following steps reflect generally how the Landfill and SWSWV allocated costs each time materials were transported to the Landfill for disposal. First, SWSWV would acquire waste

3

from a waste generator which SWSWV would then transport to the Landfill. (ECF No. 28-1 at 21,

Pritt Dep.; ECF No. 28-2 at ¶ 9, Fox Aff.). Second, after transporting the waste, SWSWV would

create an invoice for transportation and disposal which it would send to the waste generator. (*Id.*).

Third, after disposing of the waste, the Landfill would charge SWSWV certain fees for disposing

of the waste. (*Id.*).

In the alternative, if SWSWV transported its waste elsewhere, then it would only charge

the waste generator the cost of transport, and the alternate landfill would charge the waste generator

directly for disposal of the waste. (ECF No. 28-1 at 21-22, Pritt Dep.). When a company other than

SWSWV transported waste for disposal to the Landfill, the Landfill would bill the generator of the

waste for its disposal services directly. (ECF No. 28-2 at ¶ 22, Fox Aff.).

With regard to non-alumina waste that Plaintiff transported through SWSWV to the

Landfill, SWSWV billed Plaintiff for transportation and disposal of the waste. (ECF No. 28-2 at ¶

8-9, Fox Aff.). Plaintiff paid the invoices it received from SWSWV and, SWSWV, in turn, paid

Defendant the disposal fees. (*Id.*).

### d. Transporting the Alumina

Whether or not Defendant agreed to accept Plaintiff's alumina free of charge is disputed in

this case; likewise, the parties dispute whether Pritt, the Landfill or any of its agents confirmed

such an arrangement. Regardless, SWSWV started hauling several materials, including alumina,

from the Hannibal Property to the Landfill in the beginning of 2018. (ECF No. 28-1 at 12-13, Pritt

Dep.). In an effort to fortify their business relationship, Pritt met with Garner several times before

Pritt's termination in December of 2018. (*Id.* at 11). Their communications occurred in-person or

by telephone, but never through e-mail. (*Id.*). Pritt remembers discussing alumina and

solidification with Garner, but he does not remember the specifics of those conversations. (*Id.* at

4

13-14). He does recall, however, sending an email on that subject to J.P. Mascaro's environmental personnel. (*Id.* at 13).

According to Inch, in the spring of 2018, Pritt connected Plaintiff with the Landfill to discuss the transportation of a large amount of "out-of-specification industrial alumina" from the Hannibal Property to the Landfill. (ECF No. 28-4 at ¶ 10, Inch. Aff.). Due to the amount of alumina involved, Plaintiff contracted with third-party transport companies between June 19, 2018 and August 23, 2018 to deliver the alumina, instead of using SWSWV's services. (*Id.* at ¶ 11).

### e. Alumina Disposal Permits

To legally dispose of the alumina, the parties had to comply with certain West Virginia Department of Environmental Protection ("WVDEP") regulations which required Defendant to obtain minor permit modifications. (ECF No. 28-2, Fox Aff. at ¶ 12). According to Fox, on May 31, 2018, Garner completed and signed a WVDEP Waste Characterization Form for the disposal of between 1,500 and 2,000 tons of alumina at the Landfill. (*Id.* at ¶ 13; *see* ECF No. 28-6). On June 12, 2018, the WVDEP issued a Minor Permit Modification for the Disposal of Special Waste which authorized disposal of up to 2,000 tons of alumina. (ECF No. 28-2 at ¶ 14, Fox Aff.; *see* ECF No. 28-6). The WVDEP authorization called for the payment of all solid waste assessment fees upon the disposal of the alumina and for the alumina to be included in the Landfill's monthly tonnage calculations. (*Id.*). On June 27, 2018, Garner signed a Request to Revise Minor Permit Modification which increased the tonnage limit for the alumina from 2,000 tons to 4,000 tons. (ECF No. 28-2 at ¶ 15, Fox Aff.; *see* ECF No. 28-6). After receiving Plaintiff's alumina shipments and the relevant permits, Defendant began to dispose of the alumina. (ECF No. 28-2 at ¶ 11, Fox Aff.).

In accordance with the WVDEP Minor Permit Modification, the Landfill: (i) disposed of the alumina without using it for solidification; (ii) paid all solid waste assessment fees applicable to the alumina which amounted to $56,725.15; and (iii) counted the tonnage of the alumina towards the Landfill's monthly tonnage limit of 9,999 tons. (ECF No. 28-2 at ¶ 27, Fox Aff.; ECF No. 28-4 at ¶ 27, Inch. Aff.). The Landfill disposed of the alumina in its active disposal cell on the same day it was received. (ECF No. 28-2 at ¶ 18, Fox Aff.; ECF No. 28-4 at ¶ 18, Inch. Aff.). The Landfill also started sending invoices directly to Plaintiff after it disposed of the alumina. (ECF No. 28-2 at ¶ 20-22, Fox Aff.; ECF No. 28-3 at ¶ 7-8, Sassaman Aff.; Exh. E).

### f.  Alumina Disposal Invoices

From June 19, 2018 to August 23, 2018, Plaintiff shipped approximately 5,279.10 tons of alumina to the Landfill through various third-party shipping companies. (ECF No. 28-2 at ¶ 11 & 16, Fox Aff.; ECF No. 28-3 at ¶ 5, Sassaman Aff.; ECF No. 28-4 at ¶ 16, Inch. Aff.). In June of 2018, the Landfill sent an invoice to Plaintiff requesting payment for the alumina that it had delivered. (ECF No. 27-1 at ¶ 9, Spirtas Aff.). Defendant's Controller, Thomas D. Sassaman, is responsible for billing customers who dispose of waste at the Landfill. (ECF No. 28-3 at ¶ 2-3, Sassaman Aff.). Sassaman prepared invoices for all of Plaintiff's alumina deliveries, and he also sent those invoices to Plaintiff. (*Id.* at ¶ 7). According to Sassaman, Defendant never authorized anyone, including Pritt, to inform Plaintiff that the Landfill would accept the alumina under any modified conditions. (*Id.* at ¶ 14).

In July of 2018, Defendant sent Plaintiff another invoice for the alumina. (ECF No. 28-3 at ¶ 11, Sassaman Aff.). In an effort to contest the invoice, Spirtas attempted to contact Pritt, who was already terminated at that time. (ECF No. 27-1 at ¶ 11, Spirtas Aff.). Consequently, Spirtas contacted the Landfills' environmental manager to dispute the invoices Plaintiff had received. (*Id.*

at ¶ 12). Spirtas was connected via phone to Steve Medaglia who included his associate David Weiss on the call. (*Id.*). During that call, Spirtas disputed the invoices and maintained that Plaintiff would not pay them. (*Id.*). Approximately five days later, Spirtas spoke with Medaglia and Weiss for a second time, and they informed him that the Landfill had buried the alumina. (*Id.* at ¶ 13). Again, Spirtas disputed the invoices, and he informed Medaglia and Weiss that the alumina should have been used for solidification, not burial. (*Id.*).

On September 12, 2018, the Landfill sent Plaintiff a demand letter seeking $205,493.29 in payment for disposing of the alumina. (*Id.* at ¶ 14). Defendant responded five days later on September 17, 2018, disputing the letter. (*Id.*). The Landfill responded to Plaintiff with a letter disputing Defendant's claim that there was an oral agreement concerning the disposal of the alumina. (*Id.* at ¶ 15).

**B. Procedural Posture**

On October 22, 2018, Plaintiff initiated this action by filing a complaint against Defendant, alleging breach of contract, fraudulent misrepresentation and negligent misrepresentation. (ECF No. 2). Defendant filed an answer to Plaintiff's Complaint on October 26, 2018 which included counterclaims for action on account, promissory estoppel and unjust enrichment. (ECF No. 6 at 9).

On August 14, 2019, Plaintiff filed an amended complaint which clarified the working relationship between Pritt and Defendant. (ECF No. 21). In response, Defendant answered Plaintiff's Amended Complaint on August 28, 2018 and preserved the counterclaims that it had previously raised in its October 26, 2018 Answer. (ECF No. 23 at 7).

On December 2, 2019, Plaintiff moved the Court for partial summary judgment on Defendant's counterclaims for action on account and promissory estoppel. (ECF No. 26).

Thereafter, the parties participated in a mediation which took place on February 11, 2020. (ECF No. 31). The Mediator's Report concluded that the parties are at an impasse and that the case requires resolution of its dispositive motions. (*Id.*).

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.

Plaintiff argues that it is entitled to summary judgment on Defendant's counterclaims for action on account and promissory estoppel. (ECF No. 27 at 4-6). According to Plaintiff, summary judgment on the action on account counterclaim is appropriate because Defendant has neither alleged nor proved the existence of a contract. (*Id.* at 5). Plaintiff also argues that summary judgment on Defendant's counterclaim for promissory estoppel is appropriate because such a claim requires a clear and unambiguous promise to pay which, in Plaintiff's view, is nonexistent in this case. (*Id.* at 6).

Conversely, Defendant argues that summary judgment should be denied on both counterclaims. (ECF No. 28 at 2-3). Specifically, Defendant contends that, for pleading purposes, an action on account requires the parties to assert that they have conducted a series of transactions, for which a balance remains due. (*Id.* at 12). According to Defendant, the record in this case satisfies that standard because Plaintiff delivered numerous truckloads of alumina which, in turn, generated multiple invoices. (*Id.*). Defendant concedes that it must prove the necessary elements of a breach of contract, and it argues that the facts of this case demonstrate that a contract, either express or implied, existed. (*Id.* at 13-15). Defendant also contends that Plaintiff breached that contract. (*Id.*). For the same reasons set forth in support of its action on account counterclaim, Defendant argues that summary judgment is equally inapplicable to its promissory estoppel counterclaim. (*Id.* at 16-17).

### A. Action on Account

The parties do not dispute that Ohio law governs this action. Ohio courts have explained that, "[a]n action upon an account is founded in contract." *American Sec. Service, Inc. v. Baumann*, 32 Ohio App. 2d 237, 242 (Ohio Ct. App. 10th Dist. 1972). "The action exists to avoid the multiplicity

of suits necessary if each transaction between the parties (or item on the account) would be construed as constituting a separate cause of action." *Creditrust Corp. v. Richard*, Case. No. 72AP-18, 2000 Ohio App. LEXIS 3027, at \*7 (Ohio Ct. App. 2nd Dist. 2000) (citing *Baumann*, 32 Ohio App. 2d 237 at 242). "[T]o properly plead and prove an action on an account, a [party] must attach an account to the [pleading]" in accordance with Ohio Civ.R. 10(D). *Creditrust Corp.*, 2000 Ohio App. LEXIS 3027, at \*7-8; *see also* 1 Corbin on Ohio Contracts § 72.01 (2019). But when an action on account is placed in issue, the party "is required to prove all the necessary elements of a contract action, and, in addition, to prove that the contract involves a transaction or transactions that usually form the subject of a book account." *Baumann*, 32 Ohio App. 2d 237, at 244-45.

Based on the Ohio law set forth above, this Court is not persuaded the Defendant failed to plead its action on account counterclaim. As explained in *Creditrust Corp. v. Richard*, a party must attach a copy of the account to the complaint in accordance with Ohio Civ.R. 10(D) to properly plead an action on account. *Id*. Thus, contrary to Plaintiff's position, Defendant was not required to plead the elements of a contract action to support its action on account counterclaim, and its failure to do is not fatal to the counterclaim at this time. Rather, it is only after the action on account is placed in issue that a party is required to prove the necessary elements of a contract action. *Baumann*, 32 Ohio App. 2d 237, at 244-45. Accordingly, because Plaintiff has challenged the validity of Defendant's action on account claim, the Court will now examine whether Defendant has proven the necessary elements of a contract action.

### i. Proof of Contract

Although Defendant is not required to plead the elements of a contract to proceed with its action on account counterclaim, Defendant is still required to prove the necessary elements of a contract action now that Plaintiff has placed Defendant's counterclaim in issue. *Baumann*, 32 Ohio

App. 2d 237, at 244. According to Defendant, the facts of this case make clear that either an express or implied contract existed for each shipment of alumina waste. (ECF No. 28 at 15). In support of its position, Defendant highlights that Plaintiff shipped alumina to the Landfill, the Landfill disposed of the alumina at its own costs, and the Landfill billed Plaintiff for its disposal services by way of invoice. (*Id.*). In the Court's view, these circumstances create a genuine dispute as to whether a contract existed between the parties for disposal of the alumina.

Of the three forms of contract recognized under Ohio law, Defendant appears to argue that the facts of this case support the existence of either an express or implied in fact contract. (*Id.* at 13-15). In Ohio, "it is well-established that there are three classes of simple contracts: express, implied in fact, and implied in law." *Legros v. Tarr*, 44 Ohio St. 3d 1, 6 (1989) (citing *Hummel v. Hummel*, 133 Ohio St. 520, 525, (1938). "In general, the only difference between an expressed and an implied contract is in the mode of proof." *Lucas v. Costantini*, 13 Ohio App. 3d 367, 368 (Ohio Ct. App. 12th Dist. 1983).

Specifically, "[t]he difference between an express contract and an implied contract (i.e., a contract implied-in-fact) is that in express contracts, assent to the terms of the contract is actually expressed in the form of an offer and acceptance, whereas in implied contracts, the parties assent or "meeting of the minds" is inferred from the surrounding circumstances, including the parties conduct and declarations, which show that the contract exists as a matter of tacit understanding." *Rumpke v. Acme Sheet & Roofing*, Case No. 17654, 1999 Ohio App. LEXIS 5392, at *29 (Ohio Ct. App. 2nd Dist. 1999); *see also Lucas v. Costantini*, 13 Ohio App. 3d 367, 369 ("A contract implied in fact may be proved by showing that the circumstances surrounding the parties transactions make it reasonably certain that an agreement was intended.") (citing *Columbus, Hocking Valley & Toledo Ry. Co. v. Gaffney*, 65 Ohio St. 104, (1901)).

11

To prevail on a contract action, the complaining party must prove all of the essential elements of a contract, including an offer, acceptance, manifestation of mutual assent, consideration, and certainty as to essential terms of the contract. *Ameritech Publ., Inc. v. Snyder Tire Wintersville, Inc.*, 2010-Ohio-4868, at \*P23 (Ohio Ct. App. 7th Dist. 2010).

### a. Express Contract

"In express contracts, assent to the terms of the contract is actually expressed in the form of an offer and an acceptance." *Stepp v. Freeman*, 119 Ohio App. 3d 68, \*74 (Ohio Ct. App. 2nd Dist. 1997). Put another way, "[i]n express contracts, the parties express written and oral statements manifest the offer and acceptance and the parties meeting of the minds." *Alliant Food Servs. v. Powers*, 2003-Ohio-4193, at \*P27 (Ohio Ct. App. 8th Dist. 2003) (citing *Stepp v. Freeman*, 119 Ohio App. 3d at \*74). Here, the record does not reflect that there are sufficient express written or oral statements manifesting an offer and acceptance.

The undisputed facts of this case demonstrate that there were oral communications between Spirtas, Garner and Pritt concerning the shipment of alumina from the Hannibal Property to the Landfill; but whether or not Spirtas or Garner received oral communications confirming that the alumina would be accepted for free is disputed. Likewise, the only relevant written communications presented in the record are embodied in the form of invoices, permits, and demand letters. Notwithstanding the fact that the invoices are disputed, the invoices and demand letters came into being only after the alumina had already been shipped to the Landfill, well after the formulation of an express contract would have taken place. Further, although the permits issued by the WVDEP reflect an effort to comply with West Virginia regulations concerning the disposal of alumina, they do not evidence an offer or acceptance between the parties. Accordingly, none of

12

the communications presented on the record, either written or oral, establish the existence of an express contract.

### b.  Contract Implied in Fact

"A contract implied-in-fact is a contract inferred from the surrounding circumstances, including the conduct and statements of the parties, which lead to a reasonable assumption that a contract exists between the parties by tacit understanding." *Percio v. Smith*, 2014-Ohio-1266, *P15 (Ohio Ct. App. 2nd Dist. 2014). In other words, "the parties assent or meeting of the minds is inferred from the surrounding circumstances, including the parties conduct and declarations, which show that the contract exists as a matter of tacit understanding." *Rumpke v. Acme Sheet & Roofing*, 1999 Ohio App. LEXIS 5392, at *29.

The most obvious example of the use of the implied contract concept occurs where a recovery is sought for services rendered or materials furnished and the circumstances are such that people expect to be paid and pay for such conduct. *Little v. Meranda*, Case No. CA95-04-009, 1995 Ohio App. LEXIS 5040, at *4 (Ohio Ct. App. 12th Dist. 1995).  The law is said to "imply" an obligation on the part of a person who benefits from the services or materials received to pay for the services or materials. *Ashley v. Henahan*, 56 Ohio St. 559, 574 (1897).

In *Little v. Meranda,* a customer took a tractor to a mechanic for repairs. *Little v. Meranda*, 1995 Ohio App. LEXIS 5040,  at *1. While the customer testified that he did not own the tractor, his name and number was listed on the work order for the repairs. *Id.* The work order also showed that repairs were performed on the tractor which amounted to $729.03. *Id.* The record did not reveal who owned the tractor, and the tractor was ultimately collected by an unknown individual. *Id.*

The mechanic billed the customer for the repair, and, subsequently, brought a collection action for the repair charges when the customer failed to pay. *Id.* at *2. Finding the existence of an implied in fact contract, the trial court entered judgment in favor of the mechanic. *Id.* In so doing, the trial court noted that:

> if an individual brings an item to a repair shop *** and says *** I want it fixed, and the repairman does the work, then at that point the repairman is entitled to be compensated for doing that work. *** The only person with whom at this point Mr. Little had done business as far as any testimony I heard today [is] Mr. Meranda.

*Id.* at *5.

Thereafter, the customer appealed the trial court's judgment to the 12th District Ohio Court of Appeals, arguing, in part, that the trial court erred in granting judgment for appellee on an implied contract. *Id.* at *3-4. On review, the appellate court explained that, because the customer did not expressly inform anyone that he was delivering the tractor for repair work on behalf of a third-party, a reasonable person could believe from the circumstances of the transaction that the customer's intent was to pay for the repair work. *Id.* at *5. As such, the appellate court concluded that there was sufficient evidence for the trial court to imply a contract between the parties. *Id.* Consequently, the appellate court rejected the customer's assignment of error, and affirmed the judgement of the lower court. *Id.* at *4-5.

Defendant points to several circumstances which, in its view, indicate that an implied in fact contract existed for disposal of the alumina. First, Defendant highlights that, during the months of June, July and August of 2018, Plaintiff hired various transport companies to deliver thousands of tons of alumina which Defendant received and disposed of at the Landfill. (ECF No. 28 at 13). Second, Defendant maintains that it sent multiple invoices to Plaintiff, and, after receiving the invoices, Plaintiff continued to send alumina to the landfill. *Id.* at 13-14. Third, Plaintiff avers that both parties sought approval to dispose of the alumina from the WVDEP which required the parties

14

to acquire a permit explicitly calling for disposal of the alumina. *Id.* at 14. And, fourth, Defendant contends that Plaintiff understood it would be charged, absent an agreement to the contrary, based on their prior dealings and based on the fact that Plaintiff had to ask whether the alumina would be taken for free. *Id.*

These circumstances could lead a reasonable juror to infer that an implied in fact contract existed between the parties for disposal of the alumina. As it currently stands, the undisputed facts of this case establish that Plaintiff delivered alumina to the Wetzel County Landfill; that Defendant disposed of the alumina at a significant cost; and that throughout their prior dealings, Plaintiff had never asked Defendant to take deliveries free of charge. Moreover, while Plaintiff maintains that it never intended to pay for disposal of the alumina, whether or not this fact was established remains disputed. Therefore, based on the undisputed facts of this case, and after considering them in a light most favorable to Defendant, the Court concludes that a reasonable juror to could find that Defendant has satisfied its burden of proving the existence of an implied in fact contract. As such, Plaintiff is not entitled to summary judgment on Defendant's Action on Account counterclaim.

### B.  Promissory Estoppel

While Defendant asserts that its action on account counterclaim is sufficient to provide relief, it nevertheless advances a counterclaim for promissory estoppel in the event that its action on account claim fails. (ECF No. 28 at 16). Defendant argues that its claim for promissory estoppel is supported by the following: (i) Plaintiff sent alumina to the Landfill which constitutes a clear and unambiguous promise; (ii) Lackwanna reasonably relied on that promise by disposing of the alumina; (iii) landfills routinely dispose of waste and Plaintiff new or should have known that its alumina was going to be subject to disposal; and (iv) Lackwanna was damaged by its reliance "in

15

that it spent substantial resources disposing of Hannibal's alumina waste, which involved, *inter alia*, labor, tax, and regulatory costs." (*Id.* at 16-17).

Plaintiff contests the validity of Defendant's promissory estoppel claim, arguing primarily that Plaintiff has failed to demonstrate a clear and unambiguous promise. (ECF No. 29 at 7). Specifically, Plaintiff asserts that never promised to pay $205,493.29 for disposal of the alumina. (*Id.*). Plaintiff argues further that Defendant has failed to provide evidence of such a promise and that Defendant inappropriately relies upon inferences in its stead. (*Id.*). This Court agrees.

As a fundamental matter, promissory estoppel claims may be asserted in the alternative to breach of contract claims. *Lippert v. Univ. of Cincinnati*, Case No. 96API03-349, 1996 Ohio App. LEXIS 4369, at *10-11 (Ohio Ct. App. 10th Dist. 1996). "Promissory estoppel is a quasi-contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed." *Telxon Corp. v. Smart Media of Del., Inc.*, 2005-Ohio-4931, *P58 (Ohio Ct. App. 9th Dist. 2005). The elements of a promissory estoppel claim are: "(1) a clear, unambiguous promise, (2) that the person to whom the promise was made relied on the promise, (3) that reliance on the promise was reasonable and foreseeable, and (4) that the person claiming reliance was injured as a result of reliance on the promise." *Mocznianski v. Ohio Dep't of Medicaid*, 2020-Ohio-165, *P24 (Ohio Ct. App. 10th Dist. 2020).

The essential element of promissory estoppel is the promise itself. *Keller Elec. v. Gilbert*, Case. No. 17467, 1996 Ohio App. LEXIS 1542, at *14 (Ohio Ct. App. 9th Dist. 1996). While some Ohio courts have explained that a promise may arise from acts or conduct, this interpretation of the doctrine appears to conflict with well-established law in Ohio that requires a clear and unambiguous promise that cannot be satisfied by vague or ambiguous references. *Compare Kenwood Plaza v. State Teachers' Ret. Sys. Bd.*, Appeal No. C-000730, 2001 Ohio App. LEXIS

16

4117, at *18 (Ohio Ct. App. 1st Dist. 2001) *with Kingston of Miamisburg v. Maute,* 2018-Ohio-2855, *P19 (Ohio Ct. App. 1st Dist. 2018) (explaining that "[a] clear and unambiguous promise is one that the promisor would expect to induce reliance; this element is not satisfied by vague or ambiguous references."). Indeed, the conflict between these two competing interpretations appears to have arisen from a conflation of the doctrines of promissory estoppel and equitable estoppel. *See Kenwood Plaza*, 2001 Ohio App. LEXIS 4117, at *18 (noting that "both doctrines require either a promise or some form of representative conduct sufficient to justify reliance by the party asserting the doctrines"); *see also* 1 Corbin on Ohio Contracts § 8.04 (2019) (explaining that, Restatement §90 from which Ohio's standard for promissory estoppel is adopted requires a promise; and it would appear that those cases accepting acts, representations, admissions or silence as such a promise "are confusing the doctrine of equitable estoppel with that of promissory estoppel"); *see also Hortman v. City of Miamisburg,* 110 Ohio St. 3d 194, 199 (2006) (explaining that, "[p]romissory is distinct from equitable estoppel in that the representation at issue is promissory rather than a representation of fact.").

In light of the above, the Court finds that Defendant has failed to create a genuine dispute as to whether there was a clear and unambiguous promise in this case to pay for the disposal of the alumina. To conclude that there was a clear and unambiguous promise, Ohio law requires something more than references to conduct. In support of its promissory estoppel claim, Defendant does not argue that Plaintiff promised to pay $205,493.29 for disposal of the alumina. Instead, Defendant encourages the Court to draw inferences from acts, circumstances and conduct to come to this conclusion. Based on the law set forth above, this is something that the Court cannot do. *Kingston of Miamisburg v. Maute,* 2018-Ohio-2855, *P19. Consequently, Defendant has failed to create a genuine issue of material fact as to the first element of its promissory estoppel

17

counterclaim. Plaintiff is, therefore, entitled to summary judgment. *Moellering Indus., Inc. v. Nalagatla*, Case No. CA2012-10-104, 2013-Ohio-3995, *P26 (Ohio Ct. App. 12th Dist. 2013) (noting that, "unnecessary to consider the remaining elements required for promissory estoppel where the court finds that no promise was made").

IV

For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment is **DENIED in part** and **GRANTED in part**. (ECF No. 26 & 27). Defendant's counterclaim for promissory estoppel is **DISMISSED**.


       **IT IS SO ORDERED.**


**8/11/2020**                                **s/Edmund A. Sargus, Jr.**
**DATED**                                   **EDMUND A. SARGUS, JR.**
                                           **UNITED STATES DISTRICT JUDGE**