IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

HANNIBAL DEVELOPMENT, LLC
d/b/a HANNIBAL DEVELOPMENT
PARTNERS, LLC

      Plaintiff,                Case No. 2:18-cv-1265
                                      Judge Edmund A. Sargus, Jr.
  v.                                Magistrate Judge Elizabeth P. Deavers

LACKAWANNA TRANSPORT
COMPANY
d/b/a WETZEL COUNTY LANDFILL

      Defendant.

**OPINION AND ORDER**

This matter was before the Court for a bench trial on July 22, 2021. The Court now sets forth its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

**I. Background**

In the Joint Final Pretrial Order, the parties agreed to the following summations of the parties' claims:

1. Plaintiff Hannibal Development, LLC ("Hannibal") has alleged that it had an oral agreement with Defendant Lackawanna Transport Company ("Lackawanna"), doing business as Wetzel County Landfill, to deliver alumina waste material to Lackawanna without charge because Lackawanna could use the material for landfill solidification purposes. In the Amended Complaint, Hannibal has set forth claims for breach of contract, fraudulent misrepresentation, and negligent misrepresentation.

1

2. Lackawanna claims that Hannibal owes it the principal sum of $205,493.29, inclusive of $56,725.15 in solid waste assessment fees.  These sums arise from Hannibal shipping approximately 5,279.10 tons of alumina to the Wetzel County Landfill through various third-party shipping companies from June 19, 2018 to August 23, 2018.  Lackawanna has asserted counterclaims for an action on account and unjust enrichment.  Lackawanna argues that, pursuant to this Court's Opinion and Order on summary judgment (ECF No. 32), its action on account has been recognized as a contract implied-in-fact claim.  Hannibal disagrees.

At trial, the Court heard testimony from Hannibal's witnesses Eric Spirtas, the owner of Hannibal, and Tim Hayes, Esq., an attorney for Hannibal who withdrew as counsel of record in this case prior to trial.  The Court also heard testimony from Lackawanna's witnesses, Ryan Inch, Thomas Sassman, and William Fox, Jr., Esq.  Finally, the parties stipulated to the admission of the deposition transcript of David Pritt, a central witness as to the alleged oral agreement between Hannibal and Lackawanna.  (ECF No. 58.)  Plaintiff's Exhibits A through P ("Pl.'s Exs.") and Defendant's Exhibits 1–19 ("Def.'s Exs.") were admitted into the record by stipulation of the parties.  (*Id.*)  Defendant's Exhibit 20, the affidavit of Eric Spirtas (already in the record at ECF No. 27-1), was also admitted at trial without objection.

## II. Findings of Fact

The evidence in this case consists of the sworn testimony of the witnesses who testified at trial, the sworn deposition testimony of David Pritt, and all the exhibits received into evidence.  The Court will make inferences and deductions from the evidence based on reason and common sense.  As the finder of fact in this case, the Court is the sole judge of the credibility of the witnesses and the weight their testimony deserves.  The Court may be guided by the appearance and conduct

2

of a witness, or by the way a witness testifies, or by the character of testimony given, or by evidence to the contrary of testimony given.

### A. The Parties

#### 1. Hannibal Development, LLC

Hannibal is a Delaware limited liability company with its principal place of business in Hannibal, Ohio. Eric Spirtas formed Hannibal to acquire the defunct Ormet refinery in Monroe County, Ohio at a bankruptcy auction. The Ormet refinery was a large manufacturer of aluminum. Spirtas wanted to redevelop and sell that industrial property. As part of the redevelopment, Hannibal needed to remove and dispose of several types of waste. That included several thousand tons of alumina, the primary ingredient of aluminum. Alumina is a solid material similar in appearance to sand. This case is about Hannibal's removal of that alumina from the property and shipment of that alumina to Lackawanna (doing business as the Wetzel County Landfill).

#### 2. Lackawanna Transport Co. (d/b/a Wetzel County Landfill)

Lackawanna is a West Virginia corporation and is the owner/permittee of the Wetzel County Landfill in New Martinsville, West Virginia. Lackawanna is owned by Pasquale Mascaro. Mascaro and his three brothers also own J.P. Mascaro & Sons, a corporation headquartered in Audoban, Pennsylvania performing solid waste disposal and recycling services. In 2018, at the time the dispute between Hannibal and Lackawanna arose, the J.P. Mascaro & Sons website represented that it controlled "22 operating divisions." (Pl.'s Ex. N.) However, the 22 operating divisions referenced are not actually divisions of J.P. Mascaro & Sons. Rather, each "division" is a separate corporation owned by one or more of the Mascaro brothers. The corporations each utilize shared accounting, human resources, legal, and other services through the J.P. Mascaro & Sons corporation. Lackawanna (the Wetzel County Landfill) is one of those 22 companies.

### B. Hannibal Agreement with David Pritt to Ship Alumina to the Wetzel County Landfill

Another one of the companies under the J.P. Mascaro & Sons corporate umbrella is Solid Waste Services of West Virginia, Inc. ("SWSWV"). SWSWV performs waste collection and transportation services. SWSWV and Lackawanna are distinct legal entities, each wholly owned by Pasquale Mascaro. Like Lackawanna, SWSWV utilizes shared services through the J.P. Mascaro & Sons corporate office. In 2018, SWSWV was listed on the J.P. Mascaro & Sons website as one of the company's "hauling divisions," and the Wetzel County Landfill was listed as one of "our facilities." (Pl.'s Exs. G–H.)

The parties stipulated that, prior to the events giving rise to this dispute, Hannibal shipped numerous truckloads of waste materials from the old refinery to the Wetzel County Landfill and that Hannibal paid Lackawanna for disposal services. During that time, Hannibal arranged for waste disposal at the Wetzel County Landfill through David Pritt. David Pritt was the general manager of SWSWV during the time Hannibal was engaged in transportation of waste to the Wetzel County Landfill. (Deposition of David Pritt 7:16–8:3.) But Pritt was Hannibal's only point of contact for Hannibal disposing of waste at the Wetzel County Landfill.

Spirtas testified credibly that he believed Pritt to be the general manager of Lackawanna because Pritt was the only individual with whom Hannibal had contact in disposing of waste at the Wetzel County Landfill. Unbeknownst to Spirtas, Pritt was only the general manager of SWSWV and did not work for Lackawanna (the Wetzel County Landfill). Spirtas never had contact with anyone working for Lackawanna or J.P. Mascaro & Sons. Pritt's primary point of contact in dealing with Hannibal was an employee named Steve Garner. (Pritt Dep. 11:10–12.) Garner did not testify at trial. Pritt, after talking to Hannibal, would arrange for disposal of Hannibal's waste

4

at the Wetzel County Landfill through Terry Gadd, the environmental compliance manager at J.P. Mascaro & Sons. (Def.'s Ex. 19.)

Sometimes, rather than just disposing of solid waste in the landfill, a landfill can reuse the solid waste for solidifying liquid waste—a "beneficial reuse" of that waste. Spirtas, throughout his career developing industrial properties, has routinely shipped waste to landfills for beneficial reuse. According to Spirtas, landfills do not expect to be paid when accepting materials intended for beneficial reuse because waste that a landfill accepts for beneficial reuse is not a revenue generator and therefore not a tax generator. Spirtas often ships waste to landfills for free pursuant to an oral agreement with a particular landfill that it will use the waste for a beneficial reuse.

Spirtas—believing that Pritt was the general manager of Lackawanna—testified that Pritt told him that Lackawanna would accept alumina free of charge for purposes of beneficial use. Hannibal began shipping alumina to the Wetzel County Landfill in June of 2018 pursuant to that agreement. During his September 2019 deposition, Pritt denied that he ever agreed with Hannibal that the Wetzel County Landfill would accept alumina free of charge. Pritt testified that he only agreed with Steve Garner to discount the trucking fee for transporting alumina to the Wetzel County Landfill through SWSWV—the company for which Pritt worked. Pritt testified that he did not have authority to accept waste for the Wetzel County Landfill. (*Id.* at 17:24–18:4.) Pritt claimed that Hannibal asked him about the Wetzel County Landfill using the alumina for solidification and that he sent an email to Terry Gadd, but that he never heard back because he was let go "shortly after" he asked about it. (*Id.* at 13:16–24.)

Pritt emailed Gadd on May 17, 2018 stating that he met with Garner and that Garner "enquired about disposing of several hundred pounds of alumina" as well as "400–450 tons of Carbon[.]" (Def.'s Ex. 19.) Pritt also stated, "I was curious if alumina is a material we could

5

accept as it is non hazardous waste and it's in powered [form] . . . may be a good mixer for our mud." (*Id.*) Gadd responded that Lackawanna would need a Material Safety Data Sheet ("MSDS") for the alumina. (*Id.*) Gadd does not mention accepting the alumina for solidification or that Lackawanna would accept it for free. One week later, Pritt sent Gadd an email with the alumina MSDS and stated that Hannibal "would like to begin as soon as we are able." (*Id.*) A week after that, on May 31, 2018, Pritt emailed Gadd again, stating, "I was just wondering how we were looking for Hannibal Development and their Alumina?" (*Id.*) Pritt followed up again on June 12, 2018 asking if "we heard anything in regards to hauling alumina from this customer to Wetzel?" (*Id.*) Pritt followed up a final time on July 3, 2018. Gadd then internally created two different types of contracts for Hannibal; one for carbon blocks hauled to the Wetzel County Landfill through a Hannibal-selected third party (#6497), the other carbon blocks hauled to the Wetzel County Landfill by SWSWV (#3060). (*Id.*) The emails do not mention setting up a contract specifically for alumina or that alumina would be accepted for solidification.

On May 31, 2018, Steve Garner, on behalf of Hannibal, completed and signed a "West Virginia Department of Environmental Protection Waste Characterization Form" identifying Hannibal as the generator of the waste. (Def.'s Ex. 1.) Attached to that form, Terry Gadd completed and signed an "Application for Minor Permit Modification" on June 1, 2018 on behalf of Lackawanna. (*Id.*) The Application for Minor Permit Modification states, "Landfill hereby applies for a minor permit modification to dispose of the special waste characterized by this Waste Characterization Form and attached documents." (*Id.*) An application for a permit modification is necessary any time new waste is being disposed of in a landfill. The West Virginia Department of Environmental Protection granted Lackawanna a minor permit modification for "disposal" of the alumina at the Wetzel County Landfill. (Def.'s Ex. 2.) The application form does not mention

beneficial reuse or solidification. But it is unclear whether "disposal" as used in the permit modification could also include beneficial reuse; after all, solidifying liquid waste with a solid waste and disposing of the mixture still results in disposal of the original solid waste. Importantly, however, the permit modification indicated that the disposal of the alumina would "not be exempted from assessment fees"—state and local taxes—"and must be included in the monthly tonnage calculations." (*Id.*) That Lackawanna had to pay taxes on the disposal of alumina shows that Lackawanna intended to charge Hannibal for disposal.

Hannibal began shipping alumina to the Wetzel County Landfill on June 19, 2018. (Def.'s Ex. 4.) Lackawanna disposed of that waste and did not use it for solidification. Lackawanna paid taxes on the disposal of alumina consistent with the permit modification. Hannibal shipped alumina to Lackawanna every week from June 19, 2018 to August 23, 2018. Lackawanna sent weekly invoices to Hannibal for the costs of disposal under contract, including the amount paid in taxes for each disposal. (Def.'s Exs. 4–13.) Spirtas testified that Hannibal arranged for the transportation of the alumina using third-party shipping companies. The invoices show that Lackawanna billed Hannibal under contract #6497, the contract Terry Gadd established for "carbon blocks" hauled from Hannibal to the landfill by third-party shipping companies (as opposed to SWSWV). (Def.'s Exs. 4–13, 19.)

After Lackawanna sent Hannibal the first few invoices, Spirtas became aware that Lackawanna was billing Hannibal for disposal of the alumina. Spirtas testified that he immediately called David Pritt and that Pritt told him he had it taken care of.[1] Hannibal continued shipping alumina, and Lackawanna continued to dispose of the alumina and invoice Hannibal for disposal.

---

[1] Lackawanna objected to Spirtas's testimony about this phone call on grounds that Pritt's statement is hearsay. This statement is not hearsay because the Court does not consider it for the truth of the assertion that Pritt did have the matter taken care of. Rather, the Court considers Pritt's statement because it is relevant to show the reasonableness of Spirtas's belief that Pritt was an agent of Lackawanna. *See* Part III.A.2, *infra*.

7

In late July, after Hannibal received another group of invoices, Spirtas called Pritt's number again, but someone else at the landfill answered the phone. Spirtas's testimony is consistent with Pritt's testimony that his employment was terminated around July 20, 2018. (Pritt Dep. 14:13–14.)

Hannibal continued to ship alumina through August 23, 2018. (Def.'s Ex. 13.) Lackawanna continued to accept, dispose of, and bill Hannibal for disposal of the alumina. (*Id.*) In total, Hannibal shipped over 5000 tons of alumina to the Wetzel County Landfill, leading to a total amount of $205,493.29 in unpaid invoices. Hannibal does not dispute that amount and does not dispute that it received Lackawanna's invoices and did not pay those invoices. Ryan Inch, the director of engineering for J.P. Mascaro & Sons and its related companies, was responsible for ensuring that Lackawanna has proper resources to solidify waste at the Wetzel County Landfill. Inch testified credibly that he did not approve the acceptance of alumina from Hannibal for solidification in June, July, or August of 2018.

In March of 2019, Pritt spoke over the phone with Hannibal attorney Tim Hayes about the alleged oral agreement. While on the phone, Hayes prepared an affidavit for Pritt's signature reflecting the information Pritt told Hayes during the conversation. The affidavit states that Pritt was the general manager of SWSWV and that:

* * *

8. In my capacity as General Manager of SWSWV, one of my duties was to arrange for customer transportation and disposal services with respect to WCL.

9. My duties also included arranging for the acquisition of solidification material to be utilized by WCL.

10. Hannibal Development Partners ("HDP") was a customer with whom I worked with respect to WCL.

11. In the Spring of 2018, Steven Garner, the Operations Manager for HDP, and I had discussions regarding WCL's possible utilization of HDP's alumina waste for solidification purposes.

8

> 12. I told Steven Garner that WCL might well be interested acquiring the alumina waste and I paid a site visit to HDP's industrial site to inspect the material. Based upon my inspection of the product, I told Steven Garner that WCL would accept the alumina waste for solidification purposes if HDP would transport the alumina waste to WCL at the expense of HDP.
>
> 13. Steven Garner and I, on behalf of WCL, reached agreement that HDP would transport alumina waste to WCL at HDP's expense and WCL would accept the product from HDP without charge to HDP.
>
> 14. Pursuant to this agreement, HDP commenced shipping alumina waste to WCL in June 2018 and continued doing so at least through approximately July 17, 2018 when I stopped working for SWSWV.
>
> 15. In my capacity as General Manager of SWSWV, I had authority to reach agreements with WCL customers as to transportation, disposal and solidification matters.
>
> 16. HDP does not owe WCL any disposal charges for the alumina waste that it delivered to WCL by virtue of the agreement that I made on behalf of WCL with HDP.

(Pl.'s Ex. A.) After preparing the affidavit for Pritt's signature, Hayes emailed Pritt on March 5, 2019: "Please review the attached draft affidavit at your convenience. If any information in the draft affidavit is not accurate, please let me know and I will make necessary changes." (Pl.'s Ex. B.) Pritt did not respond immediately. Hayes sent Pritt follow-up emails on March 13 and March 20. (Pl.'s Ex. C.) On April 2, Pritt emailed Hayes back and stated, "Tim, Please take out number 9. It was not necessarily my 'duty' to acquire solidification material but more so an opportunity. However, with that being said, it was every manager's responsibility to save the company money!" (*Id.*) Hayes deleted paragraph 9 and emailed Pritt back that same day asking Pritt to sign the updated affidavit and have the signature notarized. (Pl.'s Ex. C.) Pritt replied: "Thank you, I will get this printed, signed and notarized today." (Pl.'s Ex. D.) Pritt did not follow through on his statement.

One week later, on April 9, Pritt sent Eric Spirtas a request for payment on the app Venmo in the amount of $7,500 with the description: "Consultation fees for work completed, we'll get this final paperwork emailed within the hour and I will overnight the hard copy!" (Pl.'s Ex. E.) Pritt was not performing any work for Hannibal at that time. Spirtas did not pay Pritt's Venmo request. And Pritt never signed and returned the affidavit to Hayes.

During Pritt's deposition in September 2019, five months after his conversation with Hayes, Pritt denied the accuracy of nearly all the information in the unsigned affidavit. (Pritt. Dep. 26:12–32:19.) Recall that when Hayes asked Pritt to review the accuracy of the affidavit, Pritt responded only that Hayes needed to take out paragraph 9 because it "was not necessarily [Pritt's] 'duty' to acquire solidification material but more so an opportunity," and then told Hayes that he would "get [the affidavit] printed, singed and notarized today." (Pl.'s Ex. B–D.) During his deposition, Pritt was asked why he only requested paragraph 9 to be deleted if the entire affidavit was inaccurate. Pritt claimed that he "hadn't actually looked at the document" and that he was "replying honestly driving down the road from [his] cell phone while talking to [Hayes] on the speaker." (Pritt Dep. 33:13–20.) Pritt claims that he raised concerns with the affidavit to Hayes "multiple times." (*Id.* at 32:20–22.)

The Court does not find Pritt's testimony credible for several reasons. First, Pritt's claim that he "hadn't actually looked at the document" is inconsistent with his specific request to remove paragraph 9 because it was not his "duty" to acquire material for solidification. Pritt's request to remove paragraph 9—but no other paragraphs—creates a strong inference that Pritt did review the document and did not take issue with the accuracy of paragraphs 10 through 16 of the original draft. (*See* Pl.'s Ex. A.)

10

Second, Hayes testified that Pritt's statement that he raised concerns to Hayes "multiple times" was not truthful and that the affidavit accurately reflected what Pritt told him on the phone. And the Court finds Hayes's testimony credible. Hayes's testimony is consistent with emails showing that Hayes followed up with Pritt multiple times after March 5, 2019 but did not hear from Pritt until Pritt responded to Hayes on April 2 and asked Hayes to delete only paragraph 9. (See Pl.'s Exs. B–D.) After Hayes replied that he deleted paragraph 9 per Pritt's request, Pritt responded within the hour and did not raise any other issues with the accuracy of the affidavit.

Third and finally, Pritt's Venmo request to Spirtas for $7,500 for "consultation fees" sent on April 9, 2019 can only be viewed as an attempt by Pritt to secure payment from Hannibal for completing the affidavit. Pritt was not performing consultation work for Hannibal at that time. Based on Spirtas's testimony and the temporal proximity of the Venmo request and Pritt's conversation with Hayes, Pritt's reference to "final paperwork" and that he would "overnight the hard copy" could only refer to the affidavit Hayes prepared for Pritt's signature. Each of these inconsistencies with Pritt's deposition testimony lead to the inference that Pritt did not fail to sign and notarize the affidavit because he believed it was inaccurate; he failed to sign and notarize the affidavit because Spirtas did not complete his request for payment in exchange for his testimony.

Thus, Pritt's testimony that he did not reach an agreement with Hannibal regarding the Wetzel County Landfill using the alumina for solidification is not credible. Weighing the credible testimony of Spirtas and Hayes against Pritt's testimony, the Court finds that Hannibal reached an agreement with David Pritt under which the Wetzel County Landfill would accept Hannibal's alumina free of charge for use as a solidifier. There is no evidence, however, that anyone working for Lackawanna or J.P Mascaro & Sons knew of or approved Pritt's agreement with Hannibal.

## III. Conclusions of Law

Hannibal asserts claims for breach of contract, fraudulent misrepresentation, and negligent misrepresentation against Lackawanna based on the oral agreement reached between Hannibal and David Pritt. Lackawanna counterclaims for account and unjust enrichment. Having found that Hannibal did reach an agreement with Pritt that Lackawanna (the Wetzel County Landfill) would accept Hannibal's alumina free of charge, the Court must now answer the legal question of whether David Pritt had the authority to bind Lackawanna to that agreement.

The evidence does not show that Pritt had authority to bind Lackawanna to the oral agreement between Pritt and Hannibal. Lackawanna therefore is not a party to the agreement between Pritt and Hannibal. Instead, Hannibal and Lackawanna formed a contract implied in fact for disposal of the alumina; Hannibal is therefore liable on Lackawanna's counterclaim for account.

### A. David Pritt did not have authority to bind Lackawanna to the agreement between Pritt and Hannibal.

A principal is bound by the acts of an agent acting within the scope of the agent's authority. *Damon's Missouri, Inc. v. Davis*, 590 N.E.2d 254, 257 (Ohio 1992). An agent can bind the principal to a contract when it has actual authority to do so, express or implied. *Id.* An agent can also bind the principal to a contract when the agent has apparent authority to do so. *Master Consol. Corp. v. BancOhio Natl. Bank*, 575 N.E.2d 817, 822 (Ohio 1991). Hannibal contends that, regardless of whether Pritt had actual authority to bind Lackawanna to the agreement, Pritt had apparent authority to bind Lackawanna to the agreement. The Court will analyze both actual and apparent authority.

### 1. David Pritt did not have actual authority to bind Lackawanna.

Actual authority can be express or implied. *Damon's Missouri, Inc.*, 590 N.E.2d at 257. Express authority is "directly granted to or conferred upon the agent or employee in express terms by the principal, and it extends only to such powers as the principal gives the agent in direct terms[.]" *Id.* (citing *Master Consolidated Corp.*, 575 N.E.2d at 820). Here, there is no evidence that Lackawanna "granted to or conferred upon" Pritt "in express terms" the authority to agree with Hannibal that Lackawanna would accept the alumina free of charge for solidification. Thus, Pritt did not have express authority to bind Lackawanna to the agreement with Hannibal.

Pritt also lacked implied authority to bind Lackawanna to the agreement. Implied authority, "[u]nless its extent is expressly limited by the principal, . . . is that authority which is incidental and necessary for the agent to carry into effect the powers expressly conferred upon him by the principal." *Kaplan Trucking Co. v. Grizzly Falls Inc.*, 86 N.E.3d 845, 853 (Ohio Ct. App. 2017) (citation omitted). Pritt was the general manager of SWSWV, a different corporation than Lackawanna. While the emails between Pritt and Terry Gadd show that Pritt worked to bring business into Lackawanna through SWSWV, there is no evidence that Lackawanna, or anyone with authority to bind Lackawanna, expressly authorized Pritt to act as an agent of Lackawanna. Therefore, Pritt could not have had actual implied authority because the purported principle did not expressly confer any power at all upon him.

### 2. David Pritt did not have apparent authority to bind Lackawanna.

An agent can also bind a principal to a contract if the agent has apparent authority to bind the principal. Apparent authority is the "power to affect the principal's legal relations by transactions with third persons arising from the purported principal's representations to such third persons." 1 CV Ohio Jury Instructions 423.01 cmt. 7. For a principal to be bound by an agent

13

under the theory of apparent authority, the evidence must show that: (1) "the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." *Master Consol. Corp.*, 575 N.E.2d at 822 (citations omitted). Importantly, the apparent authority of an agent "is to be determined by the act of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of the authority and not where the agent's own conduct has created the apparent authority." *Id.*

Hannibal presented evidence that the J.P. Mascaro & Sons website held out SWSWV (Pritt's employer) and Lackawanna (the purported principal here) as being "divisions" within the J.P. Mascaro & Sons corporation. (Pl.'s Exs. G–I.) J.P. Mascaro & Sons, SWSWV, and Lackawanna also used the same logo publicly. (*Id.*) This evidence tends to show that Lackawanna was held out to the public as being part of the same company as Pritt, and that Pritt as general manager of one division of J.P. Mascaro & Sons would have authority bind Lackawanna to a contract to accept waste for a beneficial reuse. But, even assuming that Lackawanna held Pritt "out to the public as possessing sufficient authority" to bind Lackawanna to a contract, Hannibal did not present evidence that "the person dealing with" Pritt "knew of [those] facts[.]" *Master Consol. Corp.*, 575 N.E.2d at 822. That missing link in the chain is fatal to Hannibal's argument that Pritt had apparent authority to bind Lackawanna to the agreement at issue.

Pritt delt with two people at Hannibal: Steve Garner and Eric Spirtas. Garner did not testify at trial, so there is no evidence to show what Garner did or said when dealing with Pritt.

14

Spirtas testified, and was equivocal, that he only dealt with Pritt regarding the Wetzel County Landfill. Spirtas "in good faith had reason to believe and did believe that" Pritt "possessed the necessary authority" to bind Lackawanna to a contract. *Id.* But Hannibal did not present evidence that Spirtas ever relied on any representations made by Lackawanna or J.P. Mascaro & Sons, such as those on the website, in forming his belief that Pritt was the general manager of Lackawanna. Spirtas's belief in Pritt's authority came only from the acts and representations of Pritt himself. And the conduct of the purported agent alone cannot create apparent authority to bind a purported principal. *Id.*; *Loyer v. Signature Healthcare of Galion*, 66 N.E.3d 779, 784 (Ohio Ct. App. 2016). Because Hannibal did not rely on any acts or conduct of Lackawanna in forming the belief that Pritt had authority to bind Lackawanna, Pritt did not have apparent authority to bind Lackawanna to the oral agreement between Pritt and Hannibal. *See Master Consol. Corp.*, 575 N.E.2d at 822.

In sum, Pritt did not have either actual authority or apparent authority to bind Lackawanna to the agreement that Lackawanna would accept Hannibal's alumina free of charge for solidification. Lackawanna therefore is not liable for breach of contract because it was not a party to the agreement between Hannibal and Pritt.[2] For the same reason, Lackawanna is not liable on Hannibal's alternative claims for fraudulent misrepresentation and negligent misrepresentation because those claims are also based on Pritt's representation and not those of Lackawanna.

**B. Hannibal and Lackawanna had a contract implied-in-fact under which the Wetzel County Landfill would dispose of alumina and charge for that service.**

The Court turns next to Lackawanna's counterclaim for account based on the unpaid invoices. Lackawanna claims that Hannibal owes it the balance of the unpaid invoices it sent to Hannibal

---

[2] The Court passes no judgment on whether Hannibal could maintain a breach of contract claim against SWSWV based on the agreement between Hannibal and Pritt.

15

for disposal of the alumina Hannibal shipped to the Wetzel County Landfill in June, July, and August 2018.

An "account" is "an unsettled claim or demand by one person against another, based upon a transaction creating a debtor and creditor relation[ship] between the parties." *Johncol, Inc. v. Cardinal Concession Servs., L.L.C.*, 101 N.E.3d 1014, 1019 (Ohio Ct. App. 2017) (citation omitted). An action on account constitutes a breach of contract claim. *Id.* When a defendant in an action on account disputes the existence of a contract, the plaintiff must "prove all the elements of a cause of action for breach of contract." *AMF, Inc. v. Mravec*, 440 N.E.2d 600, 603 (Ohio Ct. App. 1981). To establish a breach of contract, the plaintiff must prove (1) that there was a binding agreement; (2) that the nonbreaching party performed; (3) that the other party failed to perform its contractual obligations; and (4) that the nonbreaching party suffered damages. *Carbone v. Nueva Constr. Grp., L.L.C.*, 83 N.E.3d 375, 380 (Ohio Ct. App. 2017) (citing *Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261 (Ohio Ct. App. 1996)). Only the first element is at issue here: whether there was a binding agreement. The parties do not dispute that Lackawanna performed disposal services and that Hannibal received the invoices for those services and did not pay.

It "is well-established that there are three classes of simple contracts: express, implied in fact, and implied in law." *Legros v. Tarr*, 540 N.E.2d 257, 263 (Ohio 1989) (citing *Hummel v. Hummel*, 14 N.E.2d 923, 925–26 (Ohio 1938)). Here, as discussed on Hannibal's breach of contract claim, Hannibal and Lackawanna never reached an express oral or written agreement regarding disposal of the alumina at the Wetzel County Landfill. Lackawanna therefore proceeds on the theory that it had a contract implied in fact with Hannibal.

"An implied-in-fact contract is characterized by a meeting of the minds like an express contract; however, the implied-in-fact contract is established through an evaluation of the

16

surrounding facts and circumstances rather than written or spoken words." *Staffilino Chevrolet, Inc. v. Balk*, 813 N.E.2d 940, 950 (Ohio Ct. App. 2004). In contract law, "courts properly consider only objective manifestations of intent." *Nilavar v. Osborn*, 711 N.E.2d 726, 733 (Ohio Ct. App. 1998), *modified on reconsideration* (May 12, 1998). Because assent to contract "is to be judged objectively, the modern law properly construes both acts and words as having the meaning which a reasonable person present would ascribe to them in view of the surrounding circumstances." *Id.* (citing 1 Williston, Contracts 244, Section 4:2 (4th ed. 1990)).

"When services are rendered, work performed, or materials furnished by one person for another," for which a reasonable person would expect to be paid, the law "presumes that such services were given and received in the expectation of being paid for and implies a promise to pay what they are reasonably worth." 18 Ohio Jur. 3d Contracts § 258 (June 2021 update). For example, if a person brings an item into a repair shop and says "I want it fixed," and the shop repairs the item, an implied contract is formed because a reasonable person would believe from the circumstances that the person's intent was to pay for the repair work. *Little v. Meranda*, No. CA95-04-009, 1995 WL 669933, at *2 (Ohio Ct. App. Nov. 13, 1995).

In this case, Hannibal's act of shipping over 5000 tons of alumina and Lackawanna performing disposal services for the alumina created a contract implied in fact under which Hannibal promised to pay for Lackawanna's disposal services. Prior to the shipments of alumina, Hannibal had paid Lackawanna for disposal of numerous truckloads of waste. Hannibal and Lackawanna never discussed Lackawanna accepting alumina free of charge. Lackawanna obtained a Minor Permit Modification permitting "disposal of [the alumina] at the Wetzel County Landfill." (Def.'s Exs. 1–2.) And Lackawanna was required to pay taxes on the disposal of alumina. (*Id.*) Even though Spirtas called twice to dispute the invoices, he did not speak to

17

someone other than David Pritt until his second call in late July 2018. Nonetheless, knowing that Hannibal was being invoiced, Hannibal continued to ship—and Lackawanna continued to accept and dispose of—the alumina until August 23, 2018. (Def.'s Ex. 13.) A reasonable person in Lackawanna's position would thus expect that Hannibal intended for Lackawanna to dispose of the alumina and that Hannibal intended to pay for disposal services as it did with all other waste shipped to the Wetzel County Landfill from the old refinery.

Accordingly, because Lackawanna performed disposal services and because Hannibal has not paid, Hannibal breached the implied-in-fact contract between the two parties. Thus, Hannibal is liable on Lackawanna's counterclaim on account and must pay the outstanding balance of $205,493.29 in unpaid invoices.[3]

### IV. Conclusion

For the foregoing reasons, the Clerk is directed to close this case and to **ENTER JUDGMENT** as follows:

(1) Defendant Lackawanna Transport Company is not liable on Plaintiff Hannibal Development, LLC's claims for breach of contract, fraudulent misrepresentation, and negligent misrepresentation.

(2) Plaintiff Hannibal Development, LLC is liable on Defendant Lackawanna Transport Company's counterclaim on account. Plaintiff shall pay $205,493.29 in damages to Defendant.

**IT IS SO ORDERED.**

**8/4/2021**              s/Edmund A. Sargus, Jr.
**DATE**                   EDMUND A. SARGUS, JR.
                            UNITED STATES DISTRICT JUDGE

---

[3] Because Hannibal is liable on Lackawanna's account claim, the Court need not reach Lackawanna's equitable claim for unjust enrichment.